FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ JUN 15 2005 ★
BROOKLYN OFFICE

ORIGINAL
D&F
CIM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA

    -against-

RASENE MYTON,

           Defendant.
----------------------------------------------------------x

**MEMORANDUM**
Case Nos. 98-CR-500 (S-4) (FB)
98-CR-500 (S-6) (FB)

*Appearances:*
*For the Defendant:*
PETER J. TOMAO, ESQ.
Law Office of Peter J. Tomao
226 Seventh Street, Suite 302
Garden City, NY 11530

*For the United States of America:*
ROSLYNN R. MAUSKOPF, ESQ.
United States Attorney
By: TODD R. HARRISON, ESQ.
Assistant United States Attorney
147 Pierrepont Street
Brooklyn, NY 11201

**BLOCK, District Judge:**

Following a jury trial on the S-4 Indictment, defendant, Rasene Myton ("Myton"), was found guilty of one count of conspiracy to commit robbery (Count One), one count of attempted robbery (Count Two), one count of robbery (Count Six) and three counts of using of a firearm in connection with a crime of violence (Counts Three, Five and Seven). Myton has since made, through counsel and *pro se*, numerous post-trial motions. The Court has denied, in open court, all of them. Myton has yet to be sentenced.[1]

Included in the post-trial motions were motions for judgment of acquittal and, alternatively, for a new trial. As to Counts Two, Three, Six and Seven, Myton's

---

[1] Following his convictions on the S-4 Indictment, Myton was charged with an additional count of attempted robbery and an additional firearm charge in the S-6 Indictment. He was convicted on those counts and made post-trial motions, which the Court has also denied. Those motions are not the subject of this memorandum. Myton also awaits sentencing on the S-6 Indictment.

motions were based in part on two post-trial disclosures by the Government: (1) that a witness had committed perjury at trial; and (2) that another witness might have misidentified the victim of one of the robberies. At oral argument on the post-trial motions, the Court indicated that it would address those issues in a written format to elaborate on its conclusions that, although the Government's candid disclosures raise important and somewhat unusual issues, they do not entitle Myton to a judgment of acquittal or a new trial.

## I. BACKGROUND

Myton was charged with conspiring to rob commercial businesses and drug dealers, and with several crimes committed in the course of that conspiracy. The charges were brought under the Hobbs Act, 18 U.S.C. § 1951, and 18 U.S.C. § 924(c)

A prosecution under the Hobbs Act requires the Government to prove (1) robbery, extortion, or an attempt or conspiracy to rob or extort; and (2) interference with interstate commerce. *See* 18 U.S.C. § 1951; *United States v. Clemente*, 22 F.3d 477, 480 (2d Cir. 1994) (citing *Stirone v. United States*, 361 U.S. 212 (1960)). The required nexus to interstate commerce is minimal: "Even a potential or subtle effect on commerce will suffice." *United States v. Elias*, 285 F.3d 183, 188 (2d Cir. 2002) (internal quotation marks omitted).

Because illegal drugs move in interstate commerce, the robbery or attempted robbery of a drug dealer can be prosecuted under the Hobbs Act. *See, e.g., United States. v. Fabian*, 312 F.3d 550, 555 (2d Cir. 2002); *United States v. Jones*, 30 F.3d 276, 286 (2d Cir. 1994). When the crime at issue is inchoate – i.e., solicitation, conspiracy or attempt – the relevant inquiry is whether the defendant believed that the objective of the robbery was

illegal drugs or the proceeds of a drug deal. *See Fabian*, 312 F.3d at 555.

A prosecution under 18 U.S.C. § 924(c) requires the Government to prove that the defendant (1) knowingly (2) used or carried a firearm (3) during and in relation to a "crime of violence." *See United States v. Desena*, 287 F.3d 170, 180 (2d Cir. 2002).[2] Alternatively, the Government may prove that "(1) the defendant conspired to commit a crime involving violence...; (2) the § 924(c) offense was committed in furtherance of the conspiracy; and (3) the offense was a reasonably foreseeable consequence of an act furthering the unlawful agreement." *Rosario v. United States*, 164 F.3d 729, 734 (2d Cir. 1998) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).

## A. Counts Two and Three

Count Two charged Myton, under the Hobbs Act, with the attempted robbery of a drug dealer in Springfield Gardens, Queens, on October 31, 1996. Count Three charged him, under § 924(c), with the use of a firearm during that attempted robbery.

At trial, the Government established that members of the conspiracy planned to rob an individual later identified as George "Geego" Pessoa ("Pessoa"). On the evening of October 31, 1996, Myton and an accomplice, Frank Lake ("Lake"), accosted Pessoa as the latter was going into his house. Myton and Lake pushed Pessoa into the house and began beating him and his wife with the guns they were carrying. Pessoa fought back and, as a result, Myton and Lake fled the house without completing the robbery. The Government

---

[2]A Hobbs Act robbery qualifies as a crime of violence. *See* 18 U.S.C. § 1951(b)(1) (defining "robbery" to include "actual or threatened force, or violence, or fear of injury"); *cf. United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996) (holding that even conspiracy to commit Hobbs Act robbery qualifies as a crime of violence).

3

also established that one aim of the conspiracy was to rob individuals who sold cocaine and large quantities of marijuana, and that Pessoa was targeted for that reason.

The Government's case relied in part on the testimony of Ferdinand Joseph ("Joseph"), a cooperating witness who had been one of Myton's co-conspirators. Joseph testified that Myton and Lake were the men who attempted to rob Pessoa and that both used guns in the course of the attempted robbery. Joseph also repeatedly referred to Pessoa as a drug dealer and specifically testified that the objective of the robbery was "supposed to be the proceeds of his business" (i.e., "money and weed"). Tr. at 183.[3]

The Government did not rely solely on Joseph's testimony. Pessoa and his wife confirmed that they were attacked in their home and beaten with guns by two men, one of whom fit Myton's description. Moreover, other members of the conspiracy testified that Myton and Lake "were the people who went in" to rob Pessoa. Tr. at 336. Yet another co-conspirator, Aaron Myvett ("Myvett"), testified that the conspiracy generally targeted "[d]rug dealers, high scale drug dealers" because that was "[w]here the money was at." Tr. at 511-12. Pessoa confirmed that he worked as a manager at a health-food store that also sold marijuana from California, and that he had twice been arrested for possession of several pounds of marijuana.

Joseph's extensive criminal history was explored in detail at trial. In addition to his participation in the conspiracy at issue in the present case, Joseph admitted to being involved in at least 40 armed robberies and at least three shootings.

---

[3] Except where otherwise indicated, "Tr." refers to the transcript of the first trial.

4

One of the shootings involved the attempted robbery of a Bronx drug dealer named "Treasure" Bishop by Joseph and Kingsley Bernard (another member of the conspiracy and Myton's brother) ("Bernard"). On direct examination, Joseph testified that he and Bernard (also known as "Lee") confronted Treasure and followed him into an apartment, where Treasure's brother (another drug dealer) shot Joseph in the back. Treasure got away in the ensuing commotion and Joseph ran after him, leaving Bernard in the apartment with Treasure's brother. Joseph testified that, when he didn't catch Treasure, he returned to the apartment; as he was going back, "two shots went off." Tr. at 171. Joseph further testified that, when he got back to the apartment, he saw that Bernard had Treasure's brother in a headlock and "was shooting him like this." Tr. at 172.[4]

Joseph was extensively cross-examined regarding this incident. When challenged about his testimony as to who had shot Treasure's brother, he stated, "Lee [i.e., Bernard] did it, I was there, Lee did it." Tr. at 247. Joseph admitted: "If I had a gun in my hand, trust me, the guy that had the gun, he would have got shot because I would have shot him." Tr. at 248. Positing that Treasure's brother had Bernard in a headlock, and not the other way around, defense counsel then asked: "You're sure it wasn't you who had the gun and shot him because he had Lee in the headlock." Tr. at 249. Joseph reiterated, "No, it wasn't." *Id.*

Cross-examination also revealed that, although he understood that his cooperation agreement was in jeopardy if he did not tell the truth, Joseph had lied "about

---

[4]Joseph's demonstration of how Bernard shot Treasure's brother is not reflected in the record.

5

some stuff." Tr. at 231. For example, at a Government interview, Joseph denied using a gun during a jewelry-store robbery; Joseph later admitted he was armed. Similarly, Joseph initially stated that he got three or four expensive watches from that robbery, but admitted at trial that it was "seven or eight." Tr. at 242. Finally, Joseph told the Government that Myton "do not have anything to do with [that] robbery," Tr. at 237; when he implicated Myton in the robbery at trial, Joseph admitted that his earlier statement was a lie.

## B. Counts Six and Seven

Count Six charged Myton with the robbery of a drug dealer in the Bronx in January 1998. Count Seven charged him with using of a firearm during that robbery.

At trial, the Government established that Myton and other members of the conspiracy drove to the Bronx, where they waited in a blue van for a man in a gray BMW to drive by. Co-conspirator Anthony Trotman ("Trotman") testified that Myton and Bernard had previously received information that the man was a large-scale drug dealer. According to Trotman, when the target of the robbery showed up, Myton drove the van into the gray BMW; Trotman and others then pulled the drug dealer out of his car and put him in the van.

Trotman further testified that he and another co-conspirator, Vere Padmore ("Padmore"), had guns during the robbery, and that "[i]t was clear that guns were going to be used" to abduct the drug dealer. Tr. at 422. According to Trotman, Padmore used his gun to tap the victim on the head to "get his attention" and "everyone that was present in the van at that time saw what was going on." *Id.*

The drug dealer was then taken to Myvett's house in Brooklyn and beaten.

6

Members of the conspiracy later went to the Bronx, where they took $36,000 from the drug dealer's wife. Joseph and Myvett corroborated Trotman's account of these events.

None of the co-conspirators identified the victim of the robbery; however, Clayton Miller ("Miller") – who was not a co-conspirator – had witnessed the collision between the blue van and the gray BMW, and identified the victim as "Cat." Tr. at 484. Miller further testified that Cat sold large quantities of marijuana to out-of-state customers.

Miller's testimony was corroborated in part by Cat's sister-in-law, Lisa Marie Miller. Ms. Miller confirmed that Cat (whose real name is Rudolph Lewis) made "several thousand dollars a week selling marijuana," Tr. at 648, and added that the marijuana sold came from "[v]arious places, out of state, California, Boston." *Id.*

## C. Post-Trial Developments

Myton was convicted on Counts Two, Three, Six and Seven. At some point after trial, Myton's counsel informed the Government that

> at the time of Mr. Myton's trial, the defense was aware that the drug dealer/victim of the crime charged in Counts Six and Seven was not named Rudolph "Cat" Lewis, as the government alleged at trial, but was in fact an individual housed at the [Metropolitan Detention Center] with the defendant at the time of trial named Leon King who also used an alias of "Leon Dorman."

Letter from Mitchell A. Golub (May 29, 2003), Ex. A. Following up on that information, the Government reported back to Myton's counsel that "[t]wo of the cooperating witnesses who testified at Mr. Myton's trial [Joseph and Trotman] have now identified Leon King from a photo array as the victim of the robbery in the Bronx." *Id.*

The Government also informed Myton's counsel "that Ferdinand Joseph did

not testify candidly on cross-examination":

> Specifically, Joseph recently admitted that it was in fact he, not Kingsley Bernard [i.e., "Lee"], who shot and injured two marijuana dealers during that attempted robbery in the Bronx. During his testimony at trial, Joseph admitted that he and Bernard attempted to rob the victims, but maintained that Bernard had shot the two dealers.

*Id.*

Based on Joseph's perjury, Myton moved for a judgment of acquittal or, in the alternative, a new trial on Counts Two and Three. Based on the possible misidentification of the victim of the 1998 robbery, Myton moved for a judgment of acquittal on Counts Six and Seven.

## II. DISCUSSION

### A. Counts Two and Three: Joseph's Perjury

#### 1. *Motion for New Trial*

Witness perjury is grounds for a new trial if the defendant can show (1) that perjury was, in fact, committed; (2) that, with due diligence, the perjury could not have been discovered during trial; (3) that the perjury was material; and (4) that the perjury was not cumulative. *See United States v. Torres*, 128 F.3d 38, 48-49 (2d Cir. 1997).[5]  The

---

[5]The analysis is different if the Government knew or should have known about the perjury at the time of trial. "[I]f it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (quoting *United States v. Stofsky*, 527 F.2d 237 (2d Cir. 1975)). Where the Government should have known that a witness was committing perjury at trial, a new trial is warranted if there is "a significant chance that [the evidence of perjury], developed by skilled counsel...could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction." *Stofsky*, 527 F.2d at 243 (citing *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975)) (internal quotation marks omitted). Myton does not suggest that the Government knew or

8

Government does not dispute that Joseph committed perjury when he denied having shot Treasure Bishop's brother. There is also no contention that Myton or his counsel could have discovered the perjury before or during trial. Thus, the remaining issues – whether Joseph's perjury was material and non-cumulative – are dispositive here.[6]

### a. Material

The standard of materiality is "'whether the jury probably would have altered its verdict' had it known of the witness' false testimony." *Wallach*, 935 F.2d at 458 (quoting *Stofsky*, 527 F.2d at 246). The court must be left with "a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.* at 456.

"[I]n determining whether truthful testimony by the witness would probably have changed the jury's verdict," a court must "also assume that the jury would have known that [the witness] had lied under oath about the matter." *Stofsky*, 527 F.2d at 246. Thus, perjury can be material in two ways. First, it may directly bear upon the "the factual elements of the government's case," *id.*; for example, evidence that a witness falsely testified that the defendant committed the crime would obviously be material. Second, even when it involves a collateral issue, perjury bears upon the witness's credibility. *See*

---

should have know of Joseph's perjury at the time of trial.

[6]Although usually stated as separate considerations, *see, e.g., Torres*, 128 F.3d at 49, whether perjury is material and whether it is cumulative appear to be subsumed into the larger issue of the likely effect of the perjury on the jury's verdict. *See United States v. Gallego*, 191 F.3d 156, 161 (2d Cir. 1999) (framing issue as whether perjury "is so material and non-cumulative that its admission would probably lead to an acquittal"), *abrogated on other grounds by Crawford v. Washington*, 514 U.S. 36 (2004). Treating them separately or together has no bearing on the Court's analysis in this case; for the sake of clarity, the Court will address them separately.

*id.* "[A] witness's credibility could very well have been a factor of central importance to the jury, indeed every bit as important as the factual elements of the crime itself." *Id.* (citing *Seijo*, 514 F.2d at 1363); *see also United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992) ("The credibility of a witness who testifies as to substantive facts is critical in the trial of a case."). "The importance of evidence [of perjury] is, of course, lessened when the perjury involves some collateral matter concerning the witness, rather than facts relevant to the merits of the case." *White*, 972 F.2d at 20-21.

A witness's perjury is most likely to be material when the witness supplied the only evidence supporting the conviction. *See United States v. Wong*, 78 F.3d 73, 83 (2d Cir. 1996). "But where independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial." *Id.; see also White*, 972 F.2d at 22 (affirming denial of new trial where jury convicted defendant only on counts where other evidence corroborated testimony of witness who committed perjury).

**b. Cumulative**

A defendant moving for a new trial based on perjury must show that the perjury "is so...non-cumulative that its admission would probably lead to an acquittal." *Gallego*, 191 F.3d at 161 (citations and internal quotation marks omitted). Perjury can be cumulative of other impeachment evidence. *See, e.g., White*, 972 F.2d at 22 (concluding that evidence that witness lied at trial about prior drug use "would have been merely the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial").

10

Whether perjury constitutes cumulative impeachment evidence is a case-specific inquiry, for which the Second Circuit has provided few concrete rules. In *Seijo*, the court held that, compared to a witness's past drug use and status as a cooperating witness, perjury "has a different and more serious bearing" on credibility. *See* 514 F.2d at 1364. Similarly, in *Wallach*, the court held that newly discovered evidence that a witness had lied about having given up gambling "[could not] be said to constitute merely cumulative impeaching material." 935 F.2d at 459 (quoting *Seijo*, 514 F.2d at 1363).

On the other hand, perjury has been deemed cumulative when the other impeachment evidence specifically involved the witness's tendency to tell the truth. *See United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987) (concluding that perjury was cumulative because "ample [other] evidence was introduced to show [the witness's] propensity and motive to lie about his involvement."); *United States v. Peck*, 175 F. Supp. 2d 526, 531 (S.D.N.Y. 2001) (concluding that, because witness admitted to, *inter alia*, lying during government's investigation, "the jury had ample reasons to question [his] credibility.").

### c. Application

Joseph's perjury related solely to a collateral issue that has no bearing on the substantive factual elements of the Government's case. The perjury could, however, have had an effect on the jury's assessment of Joseph's credibility. The question, then, is whether knowing that Joseph lied about shooting Treasure Bishop's brother would have affected his credibility to the point that the Court is left with "a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Wallach*, 935 F.2d

11

at 456.

### i. *Attempted Robbery and Use of a Firearm*

Independent evidence established Myton's involvement in the attempted robbery of Pessoa and his use of a firearm during the attempt. For that reason, the Court cannot conclude that knowing about Joseph's perjury would have changed the jury's findings on those elements of Counts Two and Three.

### ii. *Interstate Commerce*

The Government was also required to show a sufficient nexus between the attempted robbery and interstate commerce. *See Elias*, 285 F.3d at 188. Without such a showing, Myton could not have been convicted. *See United States v. Perrotta*, 313 F.3d 33, 36 (2d Cir. 2002) (reversing conviction because "the link between the crime and interstate commerce is simply too attenuated to support federal Hobbs Act jurisdiction").

Robbery of an individual – even in the individual's home – has a sufficient nexus to interstate commerce "so long as the evidence supports the conclusion that the robbery targeted the assets of a business [engaged in interstate commerce]." *Wilkerson v. United States*, 361 F.3d 717, 731 (2d Cir. 2004). Thus, robbery of the proceeds of drug dealing can be prosecuted under the Hobbs Act. *See Fabian*, 312 F.3d at 555 ("It is clear, then, that under our precedent loan sharking and illegal drug transactions fall within the scope of the Hobbs Act."); *see also Wilkerson*, 361 F.3d at 731 ("[W]e have affirmed Hobbs Act convictions where the victims' businesses did not comply with all of the formalities observed in the legitimate business world and, indeed, even where the victims engaged in the buying and selling of contraband."). Thus, the Government sought to show that Myton

intended to rob Pessoa because he was a drug dealer. *See Fabian*, 312 F.3d at 555 (affirming conviction for attempted robbery under the Hobbs Act because the defendant "believed he was robbing a loan shark and the proceeds of a drug deal").

Unlike the other elements of the offenses, the evidence tying the attempted robbery to interstate commerce was thin; only Joseph specifically testified that the objective of the attempted robbery of Pessoa was "supposed to be the proceeds of his business" (i.e., "money and weed"). Tr. at 183. Nevertheless, as the Court concluded at the oral argument on Myton's post-trial motions, knowing about Joseph's perjury would not have affected the jury's decision to credit his testimony on that issue.

First, Joseph's credibility was subject to attack on numerous other grounds. To be sure, his perjury had a "a different and more serious bearing," *Wallach*, 935 F.2d at 458, than some of those grounds. For example, Joseph's perjury bears more directly on his tendency to tell the truth than does his extensive criminal history and his status as a cooperating witness. *Cf. Seijo*, 514 F.2d at 1364 (holding that new trial was warranted where cooperating witness had disclosed past use of opium and use and sale of heroin, but lied about prior conviction for marijuana possession). On the other hand, Joseph admitted to lying about other aspects of his criminal history and was thoroughly cross-examined about his involvement in the shooting of Treasure Bishop's brother; thus, Joseph's perjury was, at least to some extent, cumulative of other evidence bearing on his tendency to tell the truth.

Moreover, Joseph's testimony that the intended objective of the attempted robbery was the proceeds of Pessoa's drug business was corroborated by (1) Myvett's

13

testimony that an overarching goal of the conspiracy was to rob drug dealers, and (2) Pessoa's testimony that he managed a store where marijuana from California was sold and had twice been arrested for possession of large quantities of marijuana. At oral argument on his post-trial motions, Myton argued that this evidence was insufficient to establish that the objective of this particular robbery was the proceeds of drug dealing. The Court need not decide, however, whether Myvett and Pessoa's testimony would be sufficient, standing alone, to support a finding that Pessoa was targeted for the proceeds of his deal dealing; the point is that their testimony bolstered Joseph's testimony as to the objective of the attempted robbery, and thereby minimized the effect that his perjury would have had on that issue. *Cf. White*, 972 F.2d at 22 (affirming denial of new trial where jury convicted defendant only on counts where other evidence corroborated testimony of witness who committed perjury).

In sum, the jury, though unaware of Joseph's perjury, had ample other reasons to question his credibility. They were nevertheless entitled to credit his corroborated testimony concerning the elements of the Government's case. Thus, the Court was not left with a "firm belief," *Wallach*, 935 F.2d at 456, that "the jury probably would have altered its verdict if it had the opportunity to appraise the impact of the newly-discovered evidence [of Joseph's perjury]." *Stofsky*, 527 F.2d at 246.

### 2. *Motion for Judgment of Acquittal*

"[U]pon a motion for judgment of acquittal, 'the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly

conclude guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *United States v. Mancini*, 725 F.2d 862 (2d Cir. 1984)). In considering the motion, the Court must view the evidence in the light most favorable to the Government, and must draw all permissible inferences in the Government's favor. *See id.* Moreover, "[i]t is not for the court on a [motion for judgment of acquittal to make credibility determinations." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation and internal quotation marks omitted).

Myton's motion for judgment of acquittal based on Joseph's perjury merits no extended discussion. As explained above, Joseph's perjury raises only a credibility issue, which the Court cannot resolve on a motion for judgment of acquittal. In other words, his post-trial perjury notwithstanding, Joseph's testimony is still evidence supporting Myton's convictions on Counts Two and Three.

### B. Counts Six and Seven: Victim Misidentification

Myton's motion for a judgment of acquittal on Counts Six and Seven is based on Trotman and Joseph's post-trial identification of Leon King – as opposed to "Cat" Lewis – as the victim of the 1998 robbery. Taken in the light most favorable to the Government, however, the evidence was sufficient to support the convictions on those counts. Trotman's testimony established that Myton was involved in the 1998 robbery of a drug dealer in the Bronx; Joseph and Myvett corroborated this testimony. On those facts alone, Myton could properly have been convicted. *See Jones*, 30 F.3d at 286 (affirming conviction

under Hobbs Act for robbery of undercover agent during drug deal).[7]

The identity of the victim was simply not part of the Government's burden of proof. At oral argument, Myton argued that Miller's testimony was nevertheless relevant because it corroborated the co-conspirators' version of events. It is certainly true that, in addition to testifying that Lewis was the victim, Miller testified that he saw a blue van collide with a gray BMW and then saw several men put the driver of the BMW into the van. Even without that testimony, however, there is sufficient evidence to support the convictions on Counts Six and Seven; the sufficiency of the evidence is the dispositive issue on a motion for a judgment of acquittal. *See Guadagna,* 183 F.3d at 129.

Moreover, the corroborating effect of Miller's testimony was limited to confirming that a blue van collided with a gray BMW, and that the driver of the BMW was then pulled out of his car and put into the van. The co-conspirators' post-trial identification of the victim of the robbery as Leon King does not directly contradict Miller's testimony on those points; at best, evidence that the victim was King calls into question Miller's powers of perception and recollection; i.e., his credibility. As previously explained, the Court cannot resolve credibility issues on a motion for judgment of acquittal. *See Autuori,* 212 F.3d at 118.

Myton's counsel has expressly disclaimed seeking a new trial on Counts Six

---

[7] Although there is no evidence that Myton used a gun during the 1998 robbery, there was evidence that Trotman and Vere Padmore used guns to abduct the victim. Coupled with the evidence that Myton was part of a conspiracy to commit that crime, and that the use of guns during the crime was reasonably foreseeable, there was ample evidence that Myton was guilty of the crime charged in Count Seven on a *Pinkerton* theory of liability. *See Rosario,* 164 F.3d at 734.

16

and Seven. *See* Tr. of Jun 23, 2003, at 7. The Court could, however, *sua sponte* convert the motion for judgment of acquittal into a motion for new trial "to avoid a miscarriage of justice." *See United States v. Clemente*, 2004 WL 97689, at *11 (S.D.N.Y. 2004) (internal quotation marks omitted). Such circumstances are not present here, however, because a new trial on those counts is not warranted.

The co-conspirators' post-trial identifications might suggest a motion for new trial based on newly discovered evidence.[8] As previously explained, however, a motion for a new trial based on newly discovered evidence must show, *inter alia*, that the evidence was newly discovered (i.e., "that, with due diligence, [the defendant] could not have discovered the evidence during trial," *Torres*, 128 F.3d at 48-49), and was material. Outside the perjury context, newly discovered evidence is material if it "would probably lead to an acquittal." *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (internal quotation marks omitted). Neither element is satisfied here.

As to whether the evidence of misidentification was "newly discovered," the Government represents that, "at the time of Mr. Myton's trial, the defense was aware that the drug dealer/victim of the crime charged in Counts Six and Seven was not named Rudolph 'Cat' Lewis, as the government alleged at trial, but was in fact an individual housed at the MDC with the defendant at the time of trial named Leon King who also used an alias of 'Leon Dorman,'" Letter from Mitchell A. Golub (May 29, 2003), Ex. A. Myton does not dispute that representation. Thus, Myton cannot contend that the post-trial

---

[8]No other grounds for a new trial are apparent.

17

identifications were "newly discovered."

With respect to materiality, the independent evidence supporting the convictions and the limited effect of the post-trial identifications on Miller's credibility militate against a determination that the cooperating witnesses' post-trial identifications are sufficiently material to warrant a new trial. The Court simply cannot credit that a conflict between Miller on the one hand, and Trotman and Joseph on the other, as to the identity of the victim of the 1998 robbery would probably have led to an acquittal on Counts Six and Seven.

### III. CONCLUSION

Joseph's perjury is not grounds for a judgment of acquittal or a new trial on Counts Two and Three. Furthermore, the possible misidentification of the victim of the 1998 robbery is not grounds for a judgment of acquittal or a new trial on Counts Six and Seven.

FREDERIC BLOCK
United States District Judge

Brooklyn, New York
June 14, 2005